Case No. 15-1328 et al., Mechichem Fluor, Inc. Petitioner, Environmental Protection Agency Mr. Himmelfarb for the petitioner, Mr. Magenfarb for respondent, Mr. Lorenzen for the intervener Good morning Good morning, Judge Brown and may it please the Court This case involves the so-called SNAP program that EPA created pursuant to Section 612 of the Clean Air Act, which authorizes the agency to determine what substances may replace ozone-depleting substances as they are phased out under other provisions of the Act. The primary question in the case is whether EPA may use the SNAP program to ban non-ozone-depleting substances that have already replaced ozone-depleting substances in particular uses. The answer is no. In attempting to use SNAP for this purpose, EPA has exceeded its authority under the statute, the SNAP regulations, the initial SNAP rule, and prior agency practice. In the process, EPA has turned a limited program into a limitless one. I'll begin with the statute, which makes clear that the regulatory authority that Congress granted EPA encompasses the replacement of ozone-depleting substances and nothing more. Can I, before you get into that, address timeliness? So your petition is that you're not challenging the SNAP program or the SNAP regulations, right? That's right. Well, we raise a number of challenges. The one I was just discussing is a challenge to the statutory authority, and for that matter, the regulatory authority of the agency to ban non-ozone-depleting substances that are currently in use. And it's our submission that that challenge is timely because EPA had never attempted to assert its authority for that purpose before. Hadn't they done so using the SNAP regulations? I'm sorry? Hadn't they done so, in fact, using the SNAP regulations? No, not at all. The only time it had delisted substances under the program were delistings of ozone-depleting substances, and it's our position that that's entirely consistent with the statute and with the regulations and with the program. And far from having ever done that before, EPA said in the initial SNAP rule, principally on page 13,052 of Volume 59 of the Federal Register, this is in 1994, that it wasn't going to do what it has now done. It talked about the difference between first-generation substitutes and second-generation substitutes, and it made clear that for these industrial sectors and for these end-uses, there was a time when ozone-depleting substances were in use, Class I or Class II, CFCs or HCFCs, and at that point in time, EPA could, under the SNAP program, create a list of chemicals that could replace those ozone-depleting substances. Those would be first-generation substitutes. But once first-generation non-ozone-depleting substitutes are in use and all agree that they are in use now for all of the relevant sectors covered by the rule for all of the relevant end-uses, the SNAP program no longer has any work to do. If EPA is of the view that first-generation non-ozone-depleting substances have some adverse effect on human health or the environment, there may be other mechanisms for banning or otherwise limiting them. Indeed, in the very portion of the Federal Register that I just alluded to, EPA itself said other regulatory programs, example, other sections of the CAA Clean Air Act or Section VI of the Toxic Substance Control Act, exist to ensure protection of human health and the authority to take care of what it perceives to be a problem with non-ozone-depleting substances, but that authority, we submit, does not come from SNAP. They can change the list, correct? Judge Kavanaugh, they can change the list so long as ozone-depleting substances are in use, and they have done that. And where do you get that latter part from the statutory language? Because it does not speak in terms of adverse effects to human health or the environment, and then says do a list of safe alternatives and do a list of prohibited substitutes. And it would seem that EPA could alter that list over time, and just to give you where I'm headed with this, if I'm right that EPA can alter the list over time, then the question really becomes here, can they alter the list over time and then retroactively apply the new list to someone who took advantage of a safe alternative listed under the previous list? Is that not a right way to look at it, or where am I missing something? Well, let me try to start with the first part of your question, which is where in the statute this prohibition, or more precisely lack of authority, exists. The provisions dealing with the lists and adding to them and removing from them is in subsection C and D. This is section 612.76.71k. I mean, those provisions have to be read in light of, you know, what are really the substantive provisions of the statute, which are found in A and C, which refer unmistakably to replacing class 1 and class 2 substances. And the list is of substitutes for and alternatives to class 1 and class 2 substances. So when you're talking about what can be on the list, the list is supposed to consist of things that can be used instead of ozone-depleting substances. Once ozone-depleting substances... True, but then in talking about what will be permitted as substitutes, it seems to say, again, correct me if I'm wrong, it seems to say that EPA can then determine that some substitutes are okay and some substitutes are not okay. Exactly. I'm in agreement with you on that. Depending, I think, on the substitutes, plural substitutes, adverse effects on human health and the environment. There's no question that human health and the environment is one of the critical elements of the statute and indeed of the program. But there's another critical element, which is that when making determinations about what is appropriate in light of effects on human health and the environment, those determinations are limited to the circumstance where you're replacing class 1 and class 2 substances. And one of the consequences of EPA's current reading of this statute is that it, in effect, reads out that limitation, the limitation on replacing ozone-depleting substances, and turns this into sort of a freestanding, ongoing, perpetual program that allows it to decide forever and ever, long after ozone-depleting substances have been phased out under Section 603 or 604, that something that is in use in an industry that at one time used ozone-depleting substances has an adverse effect on human health and the environment, and EPA wants something else to be used. But does your reading read out to the maximum extent practicable? Not at all, Judge Wilkins. All to the maximum. Well, what work does that do under your reading? What it does is when you are within the universe of permissible regulatory authority that I've just described, meaning when you're talking about replacing an ozone-depleting substance, and the question is what should be used instead as they're phased out, you have to ensure to the maximum extent practicable that the things that are replacing them are, you know, consistent with human health and the environment. To the maximum extent practicable does not, you know, cannot be read to, in effect, read out of the statute this limitation. So to the maximum extent practicable means that once you've got one bite at the apple and you should take the biggest bite you can, you can't go back and take a second bite. Well, let me address that because I think that's an important part of the case and it's one of the principal arguments that my adversaries make in this case, which is that, you know, it's essentially our position that once a substance is added to the list, it's got to stay there. It can't be delisted. And that's not our position at all. Our position is that EPA can add and remove as much as it wants, so long as it's complying with other provisions of the regulations, so long as there is an ozone-depleting substance in use. So if CFCs are in use, as they were at one time, EPA could say, as CFCs are phased out under Title VI of the Clean Air Act, these are the permissible replacements. And they might include other ozone-depleting substances. For example, HCFCs, which were replacements for CFCs but are themselves ozone-depleting. They might include non-ozone-depleting substances. Then there might be a transition to HCFCs, and EPA could amend the list at that point because ozone-depleting substances are still in use. So what's on the list are indeed substitutes for and alternatives to ozone-depleting substances. But if the – go ahead. What you are saying, I think, is that once EPA has a list which does not include any ozone-depleting substances, that is, that they've substituted for those, then they could make no changes, at least no deletions to that list. Well, I guess what we're saying is that the critical point, and I think this is a recurring theme, and in one form or another I think it's an answer to almost all of the Court's questions, the critical question is what is in use. And EPA itself made this clear in the initial SNAP rule. If ozone-depleting substances are in use, EPA can list and delist. It can list or delist ozone-depleting substances and non-ozone-depleting substances because the list at that point is consisting of things that will replace the things that are in use, which are ozone-depleting substances. But once the relevant industrial sectors and uses have moved away from ozone-depleting substances, and again, all agree that that's what's happened here, the SNAP program no longer has any work to do, and if EPA wants to do something about non-ozone-depleting substances that have replaced ozone-depleting substances, it has to look somewhere else. When it originally does the list and say it's considering two potential substitutes, it compares those substitutes to each other based on effects of those substitutes on human health or the environment. And it may conclude one substitute's better than the other for that purpose, and so substitute A is going to be listed as safe, and the other substitute is going to be prohibited. Is that correct so far? Yes. Okay. So suppose then 10 years later it concludes, EPA concludes, actually we were wrong, the one substitute we said is safe is actually more harmful to human health or the environment than the other substitute, so we're going to flip those two. And the one that was listed as safe is now going to be prohibited, and the one that was prohibited is now going to be listed as safe. You're saying EPA can't do that. Well, it can do that if ozone-depleting substances are in use when it does that, because either or both of them are going to be replacements for ozone-depleting substances. If they've already been phased out or replaced and a non-ozone-depleting substance is in use, it has no authority to do any of that under SNAP, and that's precisely what has happened here. It seems like the problem here, though, and I guess I'll be asking this more to EPA, is, and you're challenging my premise, but if my premise is that they can change the list 10 years later in the way I just described in the hypothetical, is it fair, permissible, consistent with statutory authority, whatever, to then retroactively tell someone who already relied on the previously listed safe alternative that actually you have to now change as opposed to telling someone that still has the ozone-depleting substance in use that you have to choose the safe alternative as we see it now rather than the prohibited alternative as we see it now? Are you following my question? It's not fair, but I don't think the court has to decide whether it's fair because Congress decided it's not fair by limiting the SNAP authority to situations where ozone-depleting substances are in use. And I think ultimately, although they never really say this explicitly, EPA's position reduces to the idea that when you replace something and then you replace the replacement and so on and so forth forever, every single time you do that, you're replacing the first thing that was replaced. I just don't think that's the way people speak English. And the example we have in our brief, which I think makes the point pretty well, is that- But you acknowledge they can replace a replacement, but only if it's an ozone-depleting substance, right? Right. So if HCFCs, which are ozone-depleting, replace CFCs, they can replace the HCFCs because under the statute they're replacing an ozone-depleting substance. But once ozone-depleting substances are no longer in use, they don't have that authority under SNAP. I'd like to reserve the remainder of my time for a vote. Thank you. Good morning, and may it please the Court. My name is Dustin Magumfar, and I represent the United States. With me at Council table is Jan Tierney from EPA's Office of General Counsel. This case is straightforward when the agency action before the Court is properly understood. Acting pursuant to Section 612 of the Clean Air Act and EPA's implementing regulations, EPA restricted the use of certain chemicals, primarily HFCs, which were approved in the 1990s as substitutes for ozone-depleting substances. This rulemaking does not ban HFCs. In fact, it actually restricts them in the final rule less than what EPA proposed in its proposal. The rulemaking applied EPA's longstanding multi-factor comparative analysis and reasonably concluded that the HFCs in question that were restricted presented a higher overall risk to human health and the environment than other approved substitutes. The only substitutes before the Court today are those that EPA restricted. The ones that EPA used as part of its comparative analysis are not before the Court. EPA's reasonable analyses and conclusions are entitled to deference, and accordingly, the petition for review should be denied. Can you just clarify a factual issue? Is it true, as your opposing colleague said, that EPA never used this authority prior to the current rule under SNAP to delist a non-ozone-depleting substance? I believe it is correct that the prior delistings have involved ozone-depleting substitutes, and I may not be correct for that, but we can assume for this morning that that is correct because it doesn't change the outcome here. Because Section 612 is not, as petitioners contend, limited to only replacing ozone-depleting substances. Section 612 is about regulating the substitutes to ozone-depleting substances. There are other sections of Title VI that focus on the ozone-depleting substitutes themselves. 612 not only allows but requires EPA, where it finds that there are other substitutes currently or potentially available that reduce overall risk to human health and the environment, to put those on the acceptable list and to delist, to remove as acceptable, the substitutes that pose a higher overall risk to human health and the environment. Nowhere in the statute, and certainly not in EPA's regulations, is there a limitation to only having that authority if the substitute itself is an ozone-depleting substance. What about your opposing counsel's statement in their briefs and also this morning that EPA itself in 1994 in the Federal Register articulated that point of view, i.e. that it can't replace the replacement? That's simply not correct, Your Honor. In fact, EPA in multiple instances in the initial rulemaking in 1994 articulated that based on either later developed alternatives or new data about previously existing alternatives, that EPA could move a substitute from the acceptable list to the unacceptable list. Go ahead. I didn't want to cut you off. Can it do that retroactively, though? In other words, can it alter the list and then tell a company that it previously made the substitution to a previously listed safe alternative, actually now you have to substitute again because we've recalculated or redetermined what is safe or not? It can, Your Honor, although I would not necessarily agree that the application of this rule, for example, is retroactive. I think it is to some. To someone who's never replaced the ozone-depleting substance, it's not retroactive because they haven't made the replacement. So you're telling them you have to make the replacement, but you have to replace it with something that's listed today as safe. But for someone who already made the replacement to something that was previously listed as safe, you are telling them actually you have to go back and now change. Well, moving forward, the company would have to change because what Section 612 requires is that Yeah, moving forward, but they had previously made a change in reliance, presumably, on EPA telling them that this was a safe alternative. Well, there's a number of points, Your Honor. In 1994, I think one issue here is the definition of replace, and in 1994, EPA interpreted replace to mean each time a substitute is replacing an ozone-depleting substance. So the act of replacing does not occur only at the first instance that a company adopts a substitute. That's a stretch. I mean, replace does seem like a one-time thing. You replace the ozone-depleting substance with a safe alternative, period. Okay, now you're telling them actually what we thought was safe we no longer think is safe, so you have to go back and replace the safe alternative with something else. That's common parlance, I believe, on replace. I disagree, Your Honor. In 1994, EPA expressly addressed this question. I mean, this interpretation of the statute by EPA has been in place for over 20 years, and EPA explained That doesn't make it right, but go ahead. in the initial rulemaking that otherwise the implication is that EPA would not anyone who started using a substitute before EPA put it on the unacceptable list would be able to use it forever, and that that could not possibly reflect Congress's intent to reduce to the maximum extent practicable the use of substitutes that pose a higher overall risk to human health and the environment. And this comes back to the example that Judge Kavanaugh, you raised this morning, that we discussed in our brief, which is that under petitioner's interpretation, EPA could never change the listing status of a non-ozone-depleting substitute once it's on the acceptable list. So EPA could learn years later that it's a powerful carcinogen that will literally kill people, and nothing could be done. Now, petitioners come back Aren't there other authorities that EPA could use in that hypothetical? Potentially, but they don't need to rely on it. And EPA has said they can look up But if there are other authorities, this is their point, so I'll ask, if there are other authorities, then we don't need to stretch, that would be their term, stretch this statute to cover that circumstance when there are other authorities that plainly would cover such a circumstance. So when you say perhaps, that could be, the perhaps could be a key issue in the case. The problem is that this isn't a stretch of the statute. I mean, the statute requires EPA to compare alternatives to one another. And if one alternative poses a higher overall risk to human health and the environment, then EPA must restrict its use. Now, petitioners respond in their reply brief, and this morning, that EPA could compare the now-understood-to-be-toxic substitute to an ozone-depleting substance, and then that could allow a change. But as I just said, 612 requires EPA to compare substitutes to one another and reject those with a higher overall risk. Just so that I'm clear, what language in the statute most supports this argument that EPA is supposed to compare alternatives to each other? Section 612C, and particularly 1 and 2, which says that it shall be unlawful for an end user to replace any class 1, any ozone-depleting substance with any substitute substance which the administrator determines may present adverse effects to human health and the environment, where the administrator has identified an alternative to such replacement that reduces overall risk and is currently or potentially available. So if there is another alternative out there that reduces overall risk to human health and the environment and is currently or potentially available, then EPA must make it unlawful to use the substitute that presents a higher overall risk. Now, there's your point is that they have to compare substitutes, potential substitutes, and two substitutes to one another and say this one substitute is actually less harmful to, poses less of a risk to human health and the environment than the other one, and so one is going to be listed as safe and the other one is going to be listed as prohibited. That's right, or otherwise restricted. There are some intermediary steps that EPA can use. But one more fundamental point. I guess I'm still stuck, and maybe I'm unique in seeing the problem that I'm seeing, but is the telling someone it's safe and then someone says, okay, we're going to spend all this money to replace the substance that's ozone-depleting with the safe alternative, and then telling them a few years later, actually you've got to go spend a lot more money to replace that safe alternative with what we now think is actually a safe alternative. It's that second step that seems to me, I don't know if it's retroactivity or what the right term is, but it does seem to pull the rug out from someone who relied on an EPA list to do what EPA wanted them to do to make the environment safer. I would add a couple additional points to the ones I've already made, Your Honor. One is that in the 1994 rulemaking, producers were fully on notice that being put on the acceptable list was not an indication of permanence. We discussed this in pages 4 to 5 in our brief. It's also at JA 51 and 866, for example. And producers of HFCs in particular were fully on notice that HFCs were not guaranteed permanence, in fact, because EPA articulated concerns about the high global warming potential of HFCs and identified them as a near-term solution. So that's one additional reason. Another is that EPA does take into account some of the issues related to transition. What's the best site you have for the companies were warned that the list could change in the future and you could be required to change from a now listed safe alternative to what we in the future think is a safer alternative? Well, we discuss, we quote to a number of passages from the initial 94 rulemaking in pages 4 to 5 of our brief. I would also point to JA 51 and 866. And then two, I have several pen sites to the initial rulemaking in 94, which would be pages 13,047, 49, 64, 71 to 72, 83. I didn't see, I mean, I guess I missed, I didn't see a specific warning in that sense. And again, this matters for the reliance interest point, which, like I said, maybe I'm the only one seeing that as an issue. For example, on page 4, we talk about there were concerns raised in 94 about the need for regulatory certainty versus the list not being fixed forever. And EPA essentially said, we're taking the middle ground, which is we're not expecting to make massive changes to the list every other day, but certainly we're not promising that once you're on the acceptable list, you get to stay there forever. EPA also expressly interpreted Section 612 as giving it the authority to move a substitute off of the acceptable list and on to the unacceptable list. So companies were fully on notice that EPA interpreted the statute as giving it that authority. If I may make one more fundamental point, which is that Petitioner's Council this morning has... Does that really respond to the argument that, well, they thought that perhaps that could be done, but only with an ozone-depleting substance, not with a non-ozone-depleting substance? There's nothing that suggests in the rulemaking that in the 1994 rulemaking that EPA was interpreting Section 612 as limiting its authority to only replacing alternatives that are themselves ozone-depleting substances. And I would point to the definition of an unacceptable listing determination in EPA's regulations also has no such cabining authority and simply says that if an alternative poses higher overall risk to human health and the environment, then it can be designated as unacceptable. Council for Petitioners this morning has arguably essentially reduced the case to a simple factual question of whether we have moved beyond ozone-depleting substances and replaced all ozone-depleting substances. And the answer is simply no. Contrary to what Petitioner's Council said this morning, EPA does not agree that we have moved on beyond ozone-depleting substances. Ozone-depleting substances are still in use in many of the end uses that are at issue in this rule. And also, very importantly, they also have this first-generation versus second-generation argument. Every substitute... What about on 13047? It says EPA expects future changes to the SNAP list to be minor and thus not to represent an undue burden on the regulated community. And that, I would argue, has proven to be true because EPA... You think this is minor? EPA said that they expect future changes to be minor, not that they promised that there would never ever be a change that wouldn't be minor. When you consider it in the context and in light of all the other statements that I have pointed to from the 1994 rulemaking, the fact that EPA has delisted other substitutes in the past... The principal change is the agency expects to make in the future to add new substitutes or sectors to the list rather than to change a substitute's acceptability. And that, generally speaking, over the last 20-plus years... Generally speaking, but not this case. EPA did not say they were never going to delist. And let's also keep in mind, this again, this is not a ban on HFCs as petitioners routinely mischaracterize this action. There are numerous... I'm just looking at the language you pointed me to where it was, quote, the warning. Don't rely on these lists. Don't rely on these lists. And actually, the language does say don't rely 100% on these lists, but you can expect that the lists are not going to have more than minor changes. And there are other statements from the rulemaking, such as the one quoted on page 4 of our brief, that says EPA appreciates the need for regulatory certainty, which is certainly reflected by the quotation that Your Honor just read, but we also are not promising permanence. We're not saying that something is going to be on here forever. And so the other key point I want to make this morning is that on this first-generation versus second-generation argument, every substitute considered by EPA in this rulemaking, the ones that they actually restricted and all the ones that they used for comparison purposes, are first-generation substitutes. And in the rulemaking, many of the substitutes that EPA used as comparisons were also approved by the agency as acceptable in 1994 and thus are clearly substitutes for ozone-depleting substances. HFCs at issue are themselves substitutes for ozone-depleting substances. And even the more recently approved substitutes, like the HFOs that are discussed, for example, were expressly found by EPA to be substitutes for ozone-depleting substances when they were put on the list of acceptable substitutes. The determination that those substitutes are acceptable and replace ozone-depleting substances is not before this Court because that's not part of the rulemaking at issue here. It is simply the state of the regulatory program that those substitutes are all on the acceptable list as replacements for ozone-depleting substances. So EPA compared first-generation substitutes against other first-generation substitutes, as we discussed in our brief, walked through its multi-factor comparative analysis and reasonably concluded that certain HFCs in certain end uses posed a higher overall risk to human health and the environment. And, Judge Kavanaugh, there's one other point I kept not making, which is that in addressing some of these concerns about transition and the fact that some substitutes have been on this list and used for a long time, EPA does take that into account when setting the phase-out dates in its rulemaking. So, for example, there's a number of instances in the final rule where EPA in the proposal said, we're proposing to move this to the unacceptable list on date X. And then they got a whole bunch of comments about why there would be technical delays in transition or concerns about the availabilities of other substitutes. And EPA said, okay, we're pushing out that date until Y. And in some instances, it was a number of years. So EPA does take into account... And that was foreshadowed as well in the 94 Federal Register. That's a helpful point for you. Thank you. So Title VI, you know, is the implementation of the Montreal Protocol. And so that was focused on ozone-depleting substances. That's what that was about, as I understand it. But as I understand your argument, even if EPA succeeds in substituting different chemicals or processes for the ozone-depleting substances so that we're no longer looking at ozone-depleting substances, your position would be the agency could nevertheless continue to substitute better alternatives forever. Like, there is no limit to that. Am I correct? That is not the agency's position, Your Honor. I'm very glad that you raised that point. And this goes to the 24th versus 25th generation alternative that was raised by Petitioners and Evereys. And first, it's a red herring because, as I just said, we're only dealing with first-generation substitutes here. But EPA has signaled, and they did discuss in the 1994 rulemaking with respect to second-generation substitutes, that when we do move beyond ozone-depleting substances, where a substitute is truly only replacing the replacement, which Petitioners argue incorrectly is what's happening here, then that would not need to be submitted to EPA under Section 612E, which is the reporting requirements. Now, that, to be clear, does not address at all whether EPA could compare a first-generation substitute to a second-generation substitute. Now, again, that's not what they did here, but EPA has never said that they couldn't. But EPA has signaled, or has indicated, while ozone-depleting substitutes are still in use and are still being replaced, EPA will continue to review substitutes under the SNAP program. But EPA has never taken the position that the program is going to last for all of eternity. Well, but it could last for a long time, as long as ozone-depleting substances are in use. And your point, and I don't think you need to run away from this, but I think your point is, yeah, if 10 years from now we determine that something on the safe list is no longer as safe as some alternative, we have the authority to alter the list. That's right. Okay. Unless the Court has other questions, we would ask that petitions be denied. Good morning, Your Honors. Thomas Lorenzen for the Respondent-Intervenor, the Comores Company, which, by the way, is a manufacturer, along with Honeywell, of those safer alternatives. And they have invested hundreds of millions of dollars in reliance on these longstanding regulations in what we think is a pretty clear statute, that this program in Section 612, a part, yes, Your Honor, of the title that is addressed in reducing and phasing out ozone-depleting substances, this section is directed specifically at encouraging the development of those new, safer alternatives. We haven't talked about it in this case, but Section 612B is a whole program designed to facilitate the innovation and develop these new, safer alternatives. That whole program doesn't have much meaning if a substance once on the list can never be replaced. The market will be flooded with these older, less safe substitutes, and there's simply no room for the new substances to come in if they, in fact, promote human health and the environment. But I think the statute, and I also want to reiterate what Mr. Magenfar just said, every one of the alternatives that is at issue here, the HFOs, was approved by EPA specifically as a replacement for CFCs. They are first-generation substitutes, just like the HFCs that the petitioners produce. So this first-versus-second-generation issue is a red herring. This is first-generation-versus-first-generation, something that is plainly within the statute, because Section 612C very plainly says not only that EPA has the discretion to remove substitutes from the list if something else is safer, it shall be unlawful to continue to replace those ozone-depleting substances with a substitute where EPA has identified an alternative that leads to lower overall risk to human health and environment, as the HFOs do compared to HFCs. And again, this is not for all end uses. It's only for end uses where the HFOs are, in fact, available. HFCs continue to be used in many other end uses. CFCs, as well, continue to be used. And, Your Honor, regarding this issue of replacement, EPA has not actually required that CFCs be removed from all cars that are on the road today and all refrigeration units. CFCs are still out there. They are still being used. They're not being produced anymore. They haven't been produced since the 1990s. But the program actually allows the drawdown in the stocks of those and the continued use of those in older products that are still in service. So we are still in a first-generation world where we are slowly but surely replacing CFCs and other ozone-depleting substances with substitutes like HFCs and like HFOs. It is plainly within EPA's authority to compare those substitutes, those alternatives, against one another and determine which one or which ones present lower overall risks to human health and environment. I would note that when HFOs were approved, they were only approved in terms of were they themselves proper substitutes for the CFCs, for the ozone-depleting substances. There is a petition process that is within Section 612, that's 612D, that allows any person, whether it's my client, whether it is an environmental group like NRDC, to petition EPA to move substances between lists or to add them or remove them from either lists. Your Honors, I don't think that provision would have any real meaning if you couldn't evaluate a substitute like HFCs when something new and better comes along. And we are still in a world where we're... What about EPA saying at the beginning we don't expect those substitutions to be more than minor? Well, I don't know that they said, I don't know their exact words. It won't happen often because it takes time to develop these things. It takes substantial investment. The exact words were EPA expects future changes to the SNAP list to be minor. And they have been minor. As they said, you haven't found an instance where it's been done before because the new, safer alternatives haven't really been developed. Do you characterize this case as minor? Well, minor in the sense of in terms of the number that have been replaced. But hundreds of millions of dollars have been invested by Chemours and Honeywell to develop these new, safer alternatives. This is significant to them, too. They have relied, just as the petitioners have relied for years, on those 1994 regulations. And indeed, Your Honor, those 1994 regulations have been very clear. And I would refer Your Honors to JA 864. Actually, I'm sorry, I'm referring to the wrong one. Let's get out the statutory addendum at page 218. Where EPA said in 1994, the agency believes that as long as Class I or Class II chemicals are being used, any substitute designed to replace these chemicals is subject to review under Section 612. So as long as CFCs continue to be used, we are merely talking about The language you just quoted doesn't tell you whether we're talking about replacement of the ozone-depleting substance or replacement of something that previously has been deemed a safe alternative. Yeah, I'm glad you reminded me of that question. Because what EPA has not done, and I think the fact that there are still cars and refrigeration units on the road that are still using CFCs, is indicative of the fact that this is prospective only. As new model cars are being produced, EPA bars the use in those of the alternatives or the substitutes that have been deemed unacceptable for that use. It does not require that you go back and pull the HFCs out of the old cars. So that reliance interest is not real. And by the way, the reliance interest would be just as adversely affected if EPA removes a substance from the list under TSCA or any other health-based statute that says you can't use this substance anymore because it's a carcinogen. It's a toxin. So there can be no expectation. Well, on reliance, usually reliance is associated with notice, and you're on notice, of course, with those other statutes. Well, you're also on notice of comment rulemaking here. Each time a substance is added to or removed from the list or moved from one list to the other, there is a full notice and comment process. Indeed, Arkham of Mexico had a full opportunity to demonstrate that their substitute was just as safe as the HFOs, and the record just doesn't support their position that EPA erred in any way. I believe I have more than used my time. Unless Your Honors have more questions, I will say thank you. Thank you. Thank you. How much time? Three seconds. Be quick. We'll give you two minutes. Thank you. That's very precise. One of the arguments my friends made was to, in essence, accept our premise, which is that the SNAP program has work to do only when ozone-depleting substances are still in use, and they make the point that there are some minor circumstances where they are still in use, but that's not the important question. The important question is EPA itself made clear. This is on page 13052 of Volume 59 of the Federal Register. This is the initial SNAP rule. What matters is that the thing that's doing the replacement is designed for use primarily in replacing existing non-ozone-depleting substances. If that's what they're doing, they are not subject to SNAP. Nobody here takes the position that ozone-depleting substances are primarily in use, far from it, and you can get a visual proof of this if you look at pages 523 and 549 of the Joint Appendix. These are charts which shows, for the various end uses and industrial sectors here, when ozone-depleting substances were in use and when not. And since 2007 or thereabouts, ozone-depleting substances have not been in use in any significant way at all for motor vehicle air conditioning. The same is true for foams, which are another use that's affected here. I have to say the idea that EPA has not replaced a replacement by delisting HFCs strikes me as a very odd argument and one I have a hard time understanding. If HFCs can no longer be used, that means that something else has to be used. And the other thing that has to be used are these other non-ozone-depleting substances that are on the list. EPA has replaced HFCs with those other substances by virtue of the action it took here that we challenged. But if there's a petition process that was in, I guess, subsection D, it wouldn't make sense for Congress to have included that because you wouldn't petition to replace something on the list with an alternative that was an ozone-depleting substance, right? Well, you could, but you could also... Again, the key question is whether ozone-depleting substances are in use. And you could petition to add a different ozone-depleting substance to the list, so long as it hasn't been phased out yet. You could petition to add a non-ozone-depleting substance to the list. But the important point we're making is that you can only petition when there's an ozone-depleting substance currently in use. Once non-ozone-depleting substances are in use, which is the case here, certainly they're primarily and mostly in use, SNAP has no work to do. Congress's intent was that SNAP would run in parallel with the phase-out of the ozone-depleting substances. As those are phased down and phased out, so too the SNAP program eventually would be phased down and phased out. Instead, under EPA's current interpretation, the phase-down and phase-out of the ozone-depleting substances are going in one direction. The SNAP program is going in the other. And this is really a case of the tail wagging the dog, using a title of the Clean Air Act called Depletion of Stratospheric Ozone to create this sort of freestanding Junior Varsity Toxic Substances Control Act, which has taken on a life of its own. And it's our submission that EPA had no authority to do that, either under the statute or under its regulations and its rule. And under your argument, 13052 makes clear, you would say, that they were only contemplating replacing ozone-depleting substitutes when they did second-generation substitutes. Absolutely. And if I could just respond to another point my colleagues made, the idea that the things that are replacing the HFCs are themselves first-generation substitutes is something with which we take issue. Even if it's true that they were added to the list at a time that ozone-depleting substances were in use, and that may or may not be true depending upon the particular sector or end use, now when HFCs are predominantly in use everywhere, whatever those things may have been at one time, they are now second-generation substitutes for first-generation substitutes. They're not first-generation substitutes for ozone-depleting substances. All right, thank you. Thank you. The case will be submitted.
judges: Brown, Kavanaugh, Wilkins